# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA



Plaintiff

**James Lucas   3341231**


versus                    CIVIL ACTION NO. 2:17-4575


Defendants

**Ralph Terry, Warden**
Mount Olive Correctional Complex
One Mountainside Way
Mount Olive, WV  25185

**Michael Coleman, (or) Commissioner DOC**
1409 Greenbrier Street
Charleston, WV  25311

**Jeff Sandy, Secretary DMAPS**
1900 Kanawha Blvd.
Bldg. 1, Suite W-400
Charleston, WV  24305


« « « « « « « » » » » » » »


# COMPLAINT

## 1.    Previous Lawsuits

**A.** Have you begun other lawsits in state or federal court dealing with the same facts involved in this action or other wise related to this action?

Yes____**X**____        No_____

**B.  All previous cases outlined in Enclosure "A", page 2.**

**(1)**

A. Is there a prisoner grievance procedure in this institution?

Yes __X__        No_____

B. Did you present the facts relating to your complaint in the state prisoner grievance procedure?

Yes __X__        No_____

C. If the answer is YES:

**1. What steps did you take?**

_____ Grievance # **2017-MOCC-Oak-116** Filed 27 Sept., 2017 ★ For whatever the reason, the grievance was never answered. ★ Petitioner finds it ironic that *a grievance filed contesting the fairness of MOCC's grievance process was ignored by MOCC.* ★ October 27, 2017, Petitioner withdrew, amended, and resubmitted the grievance. ★ Signed off by Unit Manager 1 Nov., '17 ★ The Unit Manager's response failed to address the merits of the claim. ★ Grievance appealed to Warden on 2 Nov., '17. ★ Returned to Petitioner on 16 Nov., 2017 ★


**2. What was the result?** The Warden "rejected" the Petition with the determination that: *"More than one issue was raised, see attachment. Only one issue is permitted per grievance."* ★ Petitioner views this response as MOCC's attempt at a 'red herring,' but Petitioner doesn't know the new Warden (Mr. Terry) and supposes it is possible that he is easily confused by semantics. ★ It appears the Warden is trying to convince Petitioner that if a situation like an inutile grievance process exists, and has twenty things wrong with it - *twenty separate grievances must be filed, one for each of those twenty wrong things* ★

FACT: **There is only one issue in this grievance and it is specified on Page 1 of Enclosure "A",** and that issue is **MOCC's INUTILE GRIEVANCE PROCESS.** The "issues" enumerated on page 2 (that are so confusing to the Warden) are problem areas presented as argument in support of the inutile grievance claim, - *and are not issues apart from the inept grievance process issue.* ★ The Grievance was immediately returned (16 Nov. '17) to the Warden for a second opportunity to address the grievance in accordance with DOC Policy Directive 335.00. ★ The petition was returned to Petitioner on 22 Nov., '17 with no further comment from the Warden ★ To date, (21 Nov. '17) iaw Policy Directive 335.00, both Unit Manager and Warden have been given sufficient opportunity to respond to this grievance on it's merits and have refused to do so. ★ **Petition was appealed to DOC Commissioner on 22 Nov., '17** ★ As of this date, 11 Dec., 2017, (the last day of the

Commissioner's 10-day response time allowed under   DOC Policy Directive 335.00, §"V"-D(4) the Grievance has not been returned to Petitioner   ★   As a result of the system's failure to (1) respond to this grievance on its merits, and (2) its failure to abide by Policy Directive 335 (respond within 10 working days), this **42 U.S.C. § 1983 Complaint is being filed in Federal Court on 14 Dec., 2017.** ★


**PARTIES**

(In item A. below, place your name and inmate registration number in the first blank and place your present address in the second blank.   Do the same for additional plaintiffs, if any.)

A.  Name of Plaintiff:   ___James Lucas,   3341231_____

_____   Mount Olive Correctional Complex

_____   One Mountainside Way

_____   Mount Olive, WV  25185


B. Additional Plaintiffs:  _____**NONE**_____

C. **Defendants:**  ___ As noted page # 1 _____

D. **Additional Defendants** _____**NONE**_____


**Page 2-b**

## Statement of Claim:

**Infraction:** *MOCC fails to provide a grievance process from which an inmate can effectively challenge unconstitutional exercises of authority, violations of Prison Directives, State law, and both State and Federal Constitutional Law.* The Unit Manager's response *in this particular case alone*, (Enclosure "A") and the Warden's and Commissioner's refusal to challenge that response epitomizes that failure.

Idiomatic of MOCC's vernacular, **A credible grievance process is a right, not a privilege.** *(Authority for DOC 335.00 is noted top of page 1 of DOC Policy Directive 335.00 - copy enclosed.)*

MOCC, through its illusory "grievance process" continues to deprive inmates of the only avenue available to them through which they may challenge violative conditions of their incarceration. Petitioner believes this to be a clear breach of the Due Process Clause of the Fifth and Fourteenth Amendment.

MOCC's "grievance process" (DOC Policy Directive 335.00) is deeply flawed and has been a bone of contention in the limited and rapidly dwindling rights of inmates for at least a decade. MOCC's deceptive process not only continues to rob inmates of the only option available to them to protect themselves from abuse of authority, it (1) continues to encourage the abuse of power, (2) it continues to be used to cover up violations of DOC policy, violations of State law, and violations of the Federal Constitution, and (3) it wastes both the Petitioner's time and money, as well as the Court's time.

**MOCC's 'Grievance Process'** --

a. An inmate initiates a complaint against MOCC or an MOCC employee. (See Enclosure A)

b. The grievance is submitted to the Unit Manager of the POD the inmate lives in.

c. The Unit Manager, after his/her 'investigation,' puts a 'response' on the grievance and returns it to the inmate.

The Unit Manager's reply in and of itself may be factual, or semi-so, but is seldom, if ever, apropos because in 100% of the grievances I have filed, it fails (iaw 335.00 requirements) to address the merits of the claim, and lacks any relevance to, or probative value toward resolving the grievance charged. - See Enclosure (B)

d. This is where the confusion begins to set in. *The Unit Manager's response is the only 'decision' the inmate is going to get* and in any credible legal action, a Petitioner has a right to rebut a 'decision'. Not in MOCC's process. Once the grievance is submitted, regardless of how lame or lacking in resolution the Unit Manager's reply may be, any attempt to argue it will nullify the grievance. If the inmate writes anything on the grievance in rebuttal to an inadequate or bogus response, or adds any other relevant material or information with the grievance, it is sent back "rejected" because he is in violation of MOCC's 'grievance procedure rules.' *Policy Directive 335.00, "V", C(1)*

(3)

Petitioner knows the Unit Manager's reply lacks probative relevance (Enclosure "A" *response* is a perfect example of lacking relevance) but the next step is not to challenge the credibility of a response that resolves nothing,' it is to appeal it. (confusion deepens) **It sounds like** the credibility challenge and the appeal amount to the same things, and **it sounds like** an "appeal" is the next logical step - **but neither premise is accurate!** *Continuing with MOCC's deceptive 'appeal process' assures the inmate of only one thing - by exhausting the worthless 'response' appeal, he is squandering his only chance to get an honest resolution to the real issue.* **If this appeal is wasted, the inmate does not get another.** An inmate has no way of knowing what a Unit Manager's response will be beforehand, and is forbidden to challenge the credibility of a spurious 'response' or submit any new material or information in support of his claim underline the process, so maybe he can resubmit the grievance with new argument challenging the Unit Manager's 'response'...? Nope! Verboten! (Directive 335.00 § III(9) - "... *Grounds for rejection shall include... filing a grievance on a matter that has been previously submitted in a prior grievance.*"

Despite the fact that the 'response' lacks any resoluble value and 'appealing' it is futile, the inmate faces the conundrum of having no other choice but to play the spurious 'appeals' game *because DOC policy requires that the "administrative remedies" be exhausted before an issue can be raised in court.*

More confusion - **Once the Unit Manager submits his/her 'response,' the rest of the entire grievance process is reduced to a restrictive system of "check marks."** (Enclosure "A") Clearly, the "check marks" artifice was formulated to expedite and 'cleanse' the process. In reality, it amounts to a lot of restrictions beneficial only to MOCC, and artfully keeps out any additional facts or particulars beneficial to the inmate and of consequence, not so beneficial to MOCC.

The grievance is then 'appealed' to the Warden through the use of appropriately placed check marks. The Warden, in reality, is bound by the same responsibility as is the Unit Manager - *that of responding to the petition on its merits - **but that never happens.*** The Warden makes his couple of check marks and sends it back to the petitioner, who is once again permitted to make another check mark. Next step is to appeal it to the last bastion of hope for the inmate, the Commissioner. Same process, make a check mark and drop it in the mail box. Same rules, no applicable comments allowed. Same result - **sellout!** The commish makes his/her check mark(s), returns it to the petitioner, and regardless of how utterly lacking in credibility the Unit Manager's response is, it is *fait accompli,* case closed. Moreover, DOC knows and relies heavily on the fact that inmates lack the funds to challenge the abuse of power any further, and many wouldn't if they could. *MOCC has earned its unsavory reputation of being a place where it is very risky to antagonize the prison staff.*

Petitioner has seen no evidence that convinces him that either the Warden or Commissioner *even reads a grievance,* much less 'investigates' one. According to DOC policy directive 335.00, those responsibilities can be shuffled off to a 'designee.' The Commissioner never signs or initials a grievance. A rubber stamp (sometimes readable, sometimes not) indicates the date it was received, but there is no space provided for the date it was adjudicated and returned. With the Commissioner's check marks, all accountability has been avoided and any abuse of authority covered up. The whole grievance process is an exercise in

(4)

futility **and violative of the most basic principles of Due Process.**

The present stratagem of intellectual deception referred to as a *"grievance process"* allows MOCC to perpetrate just about any subterfuge convenient to its motives - from routine, willful abuse of authority to flagrant willful abuse of the Federal Constitution. It is unfortunate and probably inescapable, but there will always be amateur 'penologists' in positions of authority - and all too often, positions that have more to do with *who they are related to and less with their ability to do a job - who believe it is their innate right to punish inmates simply because they are inmates.* Moreover, there will always be staff members who lack the temperament to deal with inmates as a result of harboring to much baggage in the form of personal bias' (i.e. woman haters, man haters, inmate haters, gay haters (or vice versa) or whatever...) that at times cloud their ability to think and act *fairly* and *reasonably.* In other words, they are human. Whether or not MOCC will admit it, *it is keenly aware of the danger to inmates when it fails to recognize and manage the 'temperament impaired'.* To deny the existence of either of these is ingenuous.

## ---R E L I E F   S O U G H T---

Petitioner believes MOCC's 'grievance process' has been bastardized past the point of redemption. In this prison, freedom from the abuse of authority isn't determined by an equitable grievance process, *it is determined in large part by an inmate's grit, his wherewithal to pay court filing fees, and a court willing to recognize the limited rights of the inmate.*

If MOCC is incapable of, or unwilling to enact a fair grievance process, Petitioner believes the Court should order one to be conceived by serious penologists. **Primary requirements:** *it needs to be more inmate friendly, and it is presently totally lacking in <u>credible</u> oversight.* It is a necessary evil for the inmate's protection, **and its 'convenience' to MOCC and DOC should take a distant second place.**

*SOME POINTS OF CONTENTION:*
1. The present Directive 335.00 (the grievance 'rules') is six duplexed pages long. Many inmates with a legitimate gripe and a third or fourth grade (or less) education would never work their way through it.

2. The grievance 'form' - the entire process, from the initial submission through two appeals, has been condensed down to one side of one page. It leaves plenty of room for 'check marks' but very little room for any meaningful comments, and no room at all for any helpful instruction for filing. (Enclosure 'A')

3. Restricting the inmate's grievance argument to one side of one page, like most other restrictive measures in 335.0, serves only MOCC's convenience, not the inmate's. *Much of the information in this treatise should have been included in the grievance but the space restrictions prohibited it.*

4. There is too much credence appended to the Unit Manager's response by both the Warden and the Commissioner. *DOC Policy Directive 335.0 "V"-C(4):* "... a decision can be rendered from a review of the grievance document." According to the directive, It is the Warden's and Commissioner's 'expectation' that the Unit Manager fully investigated the issue at his/her level, making any further investigation 'rarely'

necessary. In Petitioner's experience, the Unit Manager's response is <u>always</u> suspect, and Petitioner has seen no evidence that the Warden or Commissioner <u>ever</u> investigates to determine the legitimacy of the Unit Manager's response. Both certainly declined that obligation in this instance.

5. Considering the fact that **a grievance process exists to protect the inmate,** DOC Directive 335.0 sports a lot of unnecessary restrictive rules, constraints and shortcuts that serve only MOCC. Noted especially is that of forbidding the inmate to submit any additional information or materials at each stage of the grievance. It is clear *MOCC doesn't want it's "process" interrupted by an inmate arguing a Unit Manager's 'response' that they both know has no probative value and will resolve nothing, and the "one-shot" process insures that the issue can never be brought up again. Any credible grievance process should allow, at least at a local level, an inmate to rebut replies that lack resolution (or as in this case, so unabashedly ignore the grievance issue altogether) and if necessary, all the way to the Commissioner. It wouldn't hurt to include the commissioner's boss, the Secretary of Military Affairs.*

6. <u>Any</u> emergency situation -(urgent Medical problem, fear of sexual assault, fear of imminent threat of physical harm, ..) Directive 335.0 has multiple pages of instructions inre emergency situations that can be replaced with one sentence: *"Any inmate with concerns about or knowledge about imminent threats, i.e. health situations, sexual abuse, imminent danger of physical attack, needs to contact the unit manager straight away to determine any steps that must be taken to provide <u>immediate assistance</u> the inmate may be in need of."* (Or words to that effect.) In a prison, having to worry about *any sort of grievance process during a time of urgency could easily be life threatening.* DOC directive 335.0, "V" - F(1)(2), after filing a grievance and waiting for a review, (which may take who knows how long?) *allows up to <u>48 hours more</u> to respond to 'immediate threats'. That doesn't make much sense in an emergency situation in a prison.*

         ✦ ✦ ✦ ✦ ✦   ✦ ✦ ✦ ✦ ✦

An **<u>independent, bipartisan Grievance Committee</u>** (preferably with ombudsman services readily accessed by inmate's families) should be a serious consideration for several reasons.

a. *Filing a legitimate serious grievance against DOC, MOCC or an MOCC staff member, and having to submit it back to MOCC for a fair adjudication is the consummate example of a conflict of interest. It violates the most basic legal maxim and fundamental rule of reason that* **"no man ought to be a judge in his own cause."** MOCC's argument that its 'process' is fair because it can be appealed outside of MOCC (to the Commissioner) doesn't hold water. It is appealed outside of MOCC but **it is not appealed outside of DOC, and in fact, *they are one and the same.***

The concept of 'fairness' is especially suspect under the present 335.00 proviso that provides a built-in excuse for the Warden and Commissioner to neglect any serious attempt to 'investigate' a grievance claim because of the 'expectation' that all necessary investigation was already done by the Unit Manager. (**An aside** - Unit Manager's are employed civilians. If there is a claim against MOCC involving a federal constitution violation, how many Unit Managers (who rely on MOCC for a paycheck) are qualified to, *or willing to make an honest attempt to resolve a due process claim in favor of the inmate?)*

b.   In instances where illiterate inmates who have a legitimate complaint but find the paperwork to daunting to attempt it.

c.   It is obvious to Petitioner that both Warden and Commissioner <u>must</u> know when the Unit Manager's remarks lack any resolution to the misconduct charged.   Neither got to the positions they are in by being thick-witted.   *The Unit Manager's response to this particular grievance (Enclosure A) is a perfect example of the lack of seriousness MOCC and DOC takes toward an inmate's grievance, and the extent to which both the Warden and Commissioner will go to avoid honestly addressing a grievance.*   (More on pp 2, item 2 of this grievance and pp 3, item 5 of Enclosure "B")

d.   Just as clear to Petitioner (as so succinctly intimated in DOC Policy 335.0, "V"-C(4) are the facts that MOCC's Warden will act under the pretension of what he contends to be in the best interest of MOCC's "mission" and/or its "orderly operation" at the expense of the inmate's rights and welfare*, and both Warden and Commissioner have proven they will not hesitate to deprive an inmate of federal constitutional protections.*   Petitioner is familiar with a case where an inmate requested to marry a long-time sweetheart but MOCC denied the request because the inmate wasn't taking 'recommended' classes. (Federal civil action No. 2-13-cv-30987)   Even after quoting verbatim the Federal Constitution guarantees giving inmates   **"...a constitutionally protected right to marry..." "...Marriage is one of the 'basic civil rights of man,' fundamental to our existence and survival." "...Government may not restrict exercise of constitutionally protected rights even when that restriction takes the form of withholding a benefit, rather than applying a penalty, ..."** *both the Warden and Commissioner still chose to ignore the inmate's right to the protections guaranteed by the Federal Constitution.   It took a Federal Lawsuit to straighten them out.*

Even though all the restrictions, conditions and constraints placed arbitrarily on the inmate  by 335.0's authors seem to imply such, *the grievance process was not put into place to make life easier for the MOCC Warden or the DOC Commissioner.*   Its purpose is to act as a safeguard for the limited rights of inmates and to assist the inmate when he is faced with the prospect of having to challenge some violative aspect of his confinement.   The reason's for the system player's restrictive actions are not relevant.   Regardless of their motivations, refusing to acknowledge the inmate's already limited rights flies in the face of the very reason the grievance process exists.   A bipartisan committee would remove most of the risk of conflict of interest or bias from that process.   In its present form, MOCC's watered down, check-mark version of a grievance process does not work for the inmate.   *Again, ample evidence of that fact lies with Enclosure "A".*

As a necessary alternative, if West Virginia insists on protecting its illusory process, a drastic reduction in court filing fees is in order.   The present $400.00 for a 1983 petition is, whether intended or not, a serious hindrance to an inmate's right to access the courts.


Respectfully submitted:


_____

James Lucas                          **(7)**

\* \* \* \* \*   \* \* \* \* \*

Signed this _14th_ day of _December_ 20_17_

_____
Signature of Plaintiff

\* \* \* \* \*   \* \* \* \* \*

**I declare under penalty of perjury that the foregoing is true and correct.**

_14 Dec., 17_____
**Executed on   (date)**

_____
**Signature of Plaintiff**

_____**NA**_____
**Signature of Attorney
(if any)**

\* \* \* \* \*   \* \* \* \* \*

(8)

ONE STAPLE ONLY

Policy Directive 335.00
01 February 2014
Attachment #2

W.Va. Division of Corrections Inmate Grievance Form    Grievance No. 2017 -MOCC - OAV-116

**James A. Lucas**          **3341231**          **27 Oct., 2017** 887
Inmate Name                          DOC #                    Date of Grievance

State Nature of Grievance / Issue to be addressed (Note 1 issue per grievance be concise file with Unit Manager NO WRITING ON BACK):
This grievance was first submitted to the Unit Manager's Office on 27 Sept., 17 and went unanswered. That submission is withdrawn as a result of inactivity. It has been amended and resubmitted this date 27 Oct., 17
MOCC's present "grievance process" does not protect inmates from unconstitutional exercises of authority.

Relief Sought (state what you want):_____ An effective grievance procedure without the machinations._____

_James Lucas_    (The inmate may attach 1 8.5 x 11 sheet if necessary at this level only)
Inmate's Signature
*****************************************************************************************
Unit Manager's Response (attach additional sheet if needed)

Accepted ✓    Rejected____    Reason for rejection:_____ Date: 01 Nov 2017

Response on Merits if accepted:
Policy Directive 335.00 governs the grievance process and is available for inmate viewing

_signature_
Signature
*****************************************************************************************
Resolved:_____ (if so initial and give copy to unit manager)    Appealed to Warden/Administrator ___ (initial) Date _____

**RECEIVED**

If no response at initial level is included the inmate certifies that he/she has tendered this grievance as indicated above and no response has been issued at that level within the time frames set forth in Policy Directive 335.00

NOV 0 7 2017

Inmate's Signature                            Date
*****************************************************************************************    WARDEN'S OFFICE
Action by Warden/Administrator:    More than one issue was    MOCC
                                    raised. See attachment.
Accepted____    Rejected ✓    Reason for rejection:_____ Date:_____
                                    Only one issue is permitted, per grievance.
Response on Merits if accepted: __ Remand to Unit for further action    __ Affirm unit and/or deny grievance __ Grant the Grievance as specified
Comments_____
_____

_signature_    NOV 1 3 2017    (Attach additional sheet if necessary)
Warden/Administrator's Signature                  Date
*****************************************************************************************
Resolved:_____ (if so initial and give copy to unit manager)    Appealed to Commissioner ____ (initial)

If no response at Warden/Administrator's level is included, the inmate certifies that he/she has tendered this grievance as indicated above and no response has been issued at that level within the time frames set forth in Policy Directive 335.00

Inmate's Signature                            Date
*****************************************************************************************
Action by Commissioner:

Accepted____    Rejected____    Reason for rejection:_____ Date:_____
Response on Merits if accepted: __ Affirm Warden/Administrator and deny grievance    (Affix final stamp) ___ Other, memo attached.

*A credible grievance process is a <u>right</u>, not a <u>privilege</u>.*

In clear violation of the Due Process Clause of the Fifth and Fourteenth Amendment, MOCC's inutile "grievance process" continues to deny inmates the right to effectively challenge violations of local, state, and federal policy including and especially system *abuse of power.*

*The first issue - Suspect in all grievances is the Unit Manager's 'response.'* That "response" is the only decision the inmate is going to get, and *whether willful or otherwise, it is usually double-speak that sounds perfectly rational but lacks any probative value toward resolving the real grievance issue..*

*The second issue - Regardless of how lacking in resolution or credibility the Unit Manager's response may be, or how little it reflects grievance issues, it cannot be contested by the inmate during the "process."* That restriction alone takes any fairness out of MOCC's 'process.'

*The third issue* - When viewed in the light of all the restrictions, shortcuts, and constraints placed on the inmate in DOC Directive 335.00, it is apparent that MOCC has lost track of the fact that *the grievance process does not exist to make things convenient for system players.  It exists to protect an inmate from system abuse and to assist an inmate when he is faced with the prospect of having to challenge some other violative aspect of his confinement.  The present 'process' fails in that regard.*

*The fourth issue - MOCC's demand for strict adherence to 'grievance process rules' is in stark contrast with its own disregard for following the 'rules.'  i.e. Of the five grievances Petitioner has filed in this extended situation, two have become lost, otherwise misplaced, or simply ignored.*

The **first** grievance was filed because MOCC was (and apparently intends to continue) violating both inmates and free-world citizens right to protect themselves from the health problems caused by banning head wear during open house.  Unit Manager's "reply": *"Mr. Lucas, the wearing of hats during open house have been put into place due to the security risk it poses."*  Common knowledge, but this grievance isn't about **why** they ban hats, its about the fact that banning head covering under severe conditions violates federal protections. It resulted in the first Federal lawsuit. (2:17-cv-1007)

The **second** grievance was filed because MOCC retaliated against the inmate who filed the first grievance.  Unit Manager's "reply": *"Mr. Lucas, the band room/music room is a privilege therefore it can be taken.  IRPP compliance is going to be a requirement in the near future."*  When did it become policy to 'punish' an inmate for doing something he might not be eligible to do <u>sometime in the future?</u>  The grievance clearly states the claim of retaliation.  Unresolved!  Resulted in the second Federal lawsuit. (2:17-cv-03144)

The **third** grievance was filed because it is Petitioner's belief that MOCC is violating the 5th Amendment protection against self-incrimination with its 'mandatory' classes, and is violating the Due Process Clause of the 14th Amendment by forcing inmates to take classes by punishing those who do not.  Unit Manager's "reply": *"Participating and becoming IRPP compliant is your choice.  You are not being punished for refusing classes recommended by programs staff, simply you will not be afforded privileges that inmates who are compliant receive.  Privileges are not a right, they must be earned."*  The reality is the only 'choice' inmates have is *take the class or lose the privilege.*  A flat denial that MOCC is doing anything wrong does not resolve the claim of either of the two Federal Violations.  Resulted in the third Federal Lawsuit (2:17cv03894)

The **forth** grievance was filed because MOCC is violating State Law in failing to post all prison rules and regulations which has ultimately resulted in allowing recalcitrant staff members to manipulate the obscured 'rules' to their own selfish ends.  Unit Manager's "reply": *"DOC policies are reviewed regularly and updated as needed.  If you have suggestions for changes in policy you may present them to your POD representative or unit team.* All common knowledge and quite rational but again irrelevant to the claim that *MOCC fails to post those reviewed and updated rules iaw State law and the Due Process Clause of the federal constitution.*  That failure allows the vague and obscure unposted rules to be bastardized and manipulated by any staff member who wants to use them to satisfy personal petty gripes. Resulted in the fourth Federal Lawsuit.  Pending.

This **fifth** grievance is being filed because **in every "grievance process" instance I have experienced,** *shortcomings in the "process" have allowed MOCC to (a) avoid addressing the essential grievance issue, and/or (b) cover up staff misconduct, and/or (c) avoid accountability - especially for Federal Constitutional violations - through use of a combination of double-speak and the total lack of credible oversight.*

(2)

*A credible grievance process is a right, not a privilege.*

In clear violation of the Due Process Clause of the Fifth and Fourteenth Amendment, MOCC's inutile "grievance process" continues to deny inmates the right to effectively challenge violations of local, state, and federal policy including and especially system abuse of power.

*The first issue - Suspect in all grievances is the Unit Manager's 'response.' That "response" is the only decision the inmate is going to get, and whether willful or otherwise, it is usually double-speak that sounds perfectly rational but lacks any probative value toward resolving the real grievance issue..*

*The second issue - Regardless of how lacking in resolution or credibility the Unit Manager's response may be, or how little it reflects grievance issues, it cannot be contested by the inmate during the 'process.' That restriction alone takes any fairness out of MOCC's process.'*

*The third issue - When viewed in the light of all the restrictions, cut-cuts, and constraints placed on the inmate in DOC Directive 335.00, it is apparent that MOCC has lost track of the fact that the grievance process does not exist to make things convenient for system players. It exists to protect an inmate from system abuse and to assist an inmate when he is faced with the prospect of having to challenge some other violative aspect of his confinement.' The present 'process' fails in that regard.*

*The fourth issue - MOCC's demand for strict adherence to 'grievance process rules' is in stark contrast with its own disregard for following the 'rules.' i.e. Of the five grievances Petitioner has filed in this extended situation, two have become lost, otherwise misplaced, or simply ignored.*

The **first** grievance was filed because MOCC was (and apparently intends to continue) violating both inmates and free-world citizens right to protect themselves from the health problems caused by banning head wear during open house. Unit Manager's "reply": **"Mr. Lucas, the wearing of hats during open house have been put into place due to the security risk it poses."** Common knowledge, but this grievance isn't about **why** they ban hats, its about the fact that banning head covering under severe conditions violates federal protections. It resulted in the first Federal lawsuit. (2:17-cv-1007)

The **second** grievance was filed because MOCC retaliated against the inmate who filed the first grievance. Unit Manager's "reply": **"Mr. Lucas, the band room/music room is a privilege therefore it can be taken. IRPP compliance is going to be a requirement in the near future."** When did it become policy to 'punish' an inmate for doing something he might not be eligible to do sometime in the future? The grievance clearly states the claim of retaliation. Unresolved! Resulted in the second Federal lawsuit. (2:17-cv-03144)

The **third** grievance was filed because it is Petitioner's belief that MOCC is violating the 5th Amendment protection against self-incrimination with its 'mandatory' classes, and is violating the Due Process Clause of the 14th Amendment by forcing inmates to take classes by punishing those who do not. Unit Manager's "reply": **"Participating and becoming IRPP compliant is your choice. You are not being punished for refusing classes recommended by programs staff, simply you will not be afforded privileges that inmates who are compliant receive. Privileges are not a right, they must be earned."** The reality is the only 'choice' inmates have is *take the class or lose the privilege.* A flat denial that MOCC is doing anything wrong does not resolve the claim of either of the two Federal Violations. Resulted in the third Federal Lawsuit (2:17cv03894)

The **forth** grievance was filed because MOCC is violating State Law in failing to post all prison rules and regulations which has ultimately resulted in allowing recalcitrant staff members to manipulate the obscured 'rules' to their own selfish ends. Unit Manager's "reply": **"DOC policies are reviewed regularly and updated as needed. If you have suggestions for changes in policy you may present them to your POD representative or unit team.** All common knowledge and quite rational but again irrelevant to the claim that *MOCC fails to post those reviewed and updated rules iaw State law and the Due Process Clause of the federal constitution.* That failure allows the vague and obscure unposted rules to be bastardized and manipulated by any staff member who wants to use them to sait personal petty gripes. Resulted in the fourth Federal Lawsuit. Pending.

This **fifth** grievance is being filed because in every "grievance process" instance I have experienced, shortcomings in the "process" have allowed MOCC to (a) avoid addressing the essential grievance issue, and/or (b) cover up staff misconduct, and/or (c) avoid accountability - especially for Federal Constitutional violations through use of a combination of double-speak and the total lack of credible oversight.

(2)

RECEIVED
NOV 1 6 2017
WARDEN'S OFFICE
MOCC

## Enclosure (B)

*Lack of Relevancy between Unit Manager's "response" and the violation charged.*

**Following are the grievances that led to this action:**

**All Unit Manager's Responses are presented in their entirety.**

➔ ➔ ➔ ➔  ⬅ ⬅ ⬅ ⬅

**G1(1)   # 16-MOCC-O-88 - Filed 27 Aug. 2016 ---**

Violation claimed:  Federal Constitutional Violation of the 8th Amendment.   (See addendum B-1)     NOTE:  Addenda B-1 thru B-4 are  the four grievances filed with MOCC that led to this action.

MOCC's response --   ***"Mr. Lucas, the wearing of hats during open house have been put into place due to the security risk it poses."***

Resolution relevance:    Common knowledge, in fact so common, MOCC's 'security risk' excuse was challenged in the grievance.   This grievance isn't about <u>why</u> they ban hats, its about the fact that banning head covering under severe conditions violates federal protections guaranteed under the 8th amendment ban of  cruel and unusual treatment of inmates and civilian citizens.

★★★★★★★★★

**G1(2)  # 17-MOCC-O-51  -  Filed 4/19/17**

Violation claimed: Federal First Amendment Violation of the Right to Free Expression. (See addendum B-2)

MOCC's response -- ***"Mr. Lucas, the band room/music room is a privilege therefore it can be taken.  IRPP compliance is going to be a requirement in the near future."*** *When did it become lawful policy to start punishing an inmate for doing something that he might not be eligible to do "sometime in the near future?"*

Resolution relevance:    This grievance has nothing to do with 'rights vs privileges.' It was filed because MOCC retaliated against Petitioner for filing G1-1 above.  It clearly states the claim of MOCC's violation of DOC policy Directive 335  forbidding retaliation against an inmate for filing a grievance and a lawsuit.   It clearly brings into question the First Amendment Federal Constitutional  right to free expression.

**Page 1, Enclosure "B"**

### G1(3)  #2017-MOCC-Oak-75  -  Filed 6/26/17

Violations claimed:   (1) Federal Fifth Amendment Violation of the protection against self-incrimination.   (2)  Violation of the Due Process Clause of the 5th and 14th Amendment.   (See addendum B-3)

Unit Manager's Reply:   ***"Participating and becoming IRPP compliant is your choice.  You are not being punished for refusing classes recommended by programs staff, simply you will not be afforded privileges that inmates who are compliant receive. Privileges are not a right, they must be earned."***

Resolution relevance:      No attempt was made to address this claim on its merits. MOCC player's attempt to lay the blame for its exploitation of the inmate population on the inmate is reprehensible.  Every single "privilege" the Unit Manager refers to was once a freedom that every inmate in MOCC enjoyed and not too long ago.  They have all been gradually taken from inmates through (1) the artful manipulation of IRPP mania, and/or (2) the abuse of authority perpetrated by staff who have petty gripes against an inmate(s).

With all due respect, **inmates are being punished.**  *Taking freedoms away from an inmate that he's had for years (because he is not taking classes) that are given to another inmate (because he is taking a class) is punishing the first inmate for not taking classes.* **It doesn't get any more elementary than that.**

✶✶✶✶✶✶✶✶✶

### G1(4)  # 2017-MOCC-Oak-76  -  Filed 6/26/17

Violations claimed:

Violation of the Fifth and Fourteenth Amendment due process clause.

Violation of West Virginia Const. Art III § 10  requirement that all prison Rules and Regulations be posted.  (See addendum B-4)

MOCC's response:   ***"DOC policies are reviewed regularly and updated as needed. If you have suggestions for changes in policy you may present them to your POD representative or unit team."***

Resolution relevance:   All common knowledge but again irrelevant to the grievance claim.   This accusation is not about DOC's policy of "reviewing" or "updating" rules.  It is about MOCC's failure, once those policies are 'reviewed' and

'updated,' **to post the current versions iaw State Law** so that inmates will know what is expected of them.   It is also about MOCC's tolerating the vague and obscure  unposted rules to be manipulated by any staff member who wants to use them  to seek retaliation for satisfying petty gripes.

This grievance was 'appealed' to the commissioner on or 22 July, 2017.  In violation of DOC Directive 335.0, "V"-D(4), re a ten day response time, the grievance was never returned to petitioner.

**✶✶✶✶✶✶✶✶**

**5.  Grievance # 2017-MOCC-Oak-116** - First filing, 27 September, 2017.  In violation of DOC policy Directive 335.00, §"V"A(4), grievance was never answered.

27 October, 2017, withdrew previous submission, amended petition, and refiled.

**Violation claimed**:  MOCC's present "grievance process" does not effectively protect inmates from unconstitutional exercises of authority.

Unit Manager's conception of a "response on the merits":  **"Policy Directive 335.00 governs the grievance process and is available for inmate viewing.**  (100% true and 100% barren of probative relevance.)

*Petitioner has a sense of humor and recognizes and appreciates a good "nose-thumbing" when he gets one. (And hopes MOCC players are blessed with the same level of perspicacity.)*

*Resolution relevance: Surprisingly (not) lacking in relevance and rationale, this Unit Manager's response is a better argument for justifying court action than anything Petitioner could have come up with.*   It (a) epitomizes a response totally void of probative value: (b)  emphasizes the MOCC Warden's and the DOC Commissioner's predilection for taking whatever specious path is offered to them that will allow  them to avoid accountability for MOCC's errant behavior: (c) and it epitomizes Unit Manager's, Warden's and Commissioner's varying levels of sincerity and/or strength of integrity (or just as often the lack thereof) in abiding by their duties as specified in Policy Directive 335.00 - *that of honestly responding to the merits of a grievance rather than looking for a way to double-talk around it so MOCC can avoid accountability.*

Perhaps this 1983 will be taken a little more seriously.   Perhaps not.

Regardless, it has served its purpose

**Page 3, Enclosure "B"**

ADDENDUM 13-1

It is understood that "Open House" is a privilege and not a right. However, an inmate should not be required to waive the right to protect his health in order to enjoy one of the few 'privileges' offered by DOC.

The policy of banning any kind of head wear during Open House, especially (as it was this past open house) in 85° and 90° sun is a clear violation of the "cruel and unusual" or inhumane treatment of inmates stipulated under the 8th Amendment to the United States Constitution.

It is well documented that prisoners of the state have certain inalienable rights under the 8th Amendment of the Federal Constitution.

It is further well documented that prisoners of the state have the same inalienable rights under West Virginia Code, Art. III, §5 - and under Volume 1, Chapter 3, Fourth Edition, Rights Of Prisoners..

By the practice of banning hats during open house, MOCC, with deliberate indifference, is unnecessarily exposing the inmates to serious health issues, the least of which is sun-burn, the worst is the risk of heat-stroke, and the development of, or worsening of, melenoma skin cancer.

By the policy of refusing to allow the visitors to wear hats, DOC is also, with the same deliberate indifference, unnecessarily exposing free-world citizens to the environmental hazard of exposure to intense sunlight, when these citizens can very easily avoid that sort of inhumane treatment by donning a hat or other head covering.

While it is recognized that the banning of hats during open house is a result of some perceived "security problem", it is difficult to see how a hat or baseball cap is any more a security risk than is a shoe or any other piece of clothing, **and a hat is just as necessary - and even more so - as any other piece of clothing worn to protect a person from the suns heat.**

My forehead and nose are still peeling from the sunburn, but that is not the main reason I file this grievance. My ailing and frail 78 year old sister came to the open house and in order to listen to her brother play music one last time, was forced by the ill-advised individuals who made the spurious decision to ban hats, to sit in the 85/90 degree sun to do so. This action is an attempt to prevent that sort of unnecessary, uncivilized cruelty from happening again.

*"When the state, by the affirmative action of it's power, so restrains an individual's liberty that it renders him unable to care for himself... - e.g. ... "reasonable safety" - it transgresses the substantive limits on state action set by the Eighth Amendment.* **DeShaney v. Winnebago County, 489 U.S. 189, S.Ct 998, 1005, and 103 L.Ed.2d 249 (1989)**

*"While the state has the power... the Eighth Amendment stands to assure that this power be exercised within the limits of civilized standards.:* **State ex rel, Pingley V. Coiner, 155 W.Va 591, 186 S.E.2D 220,** (1972)

"Habeas Corpus lies to secure relief from conditions of imprisonment which constitutes cruel and unusual punishment, in violation of this section and of the Eighth Amendment of the Constitution of the United States." **State ex rel, Pingley v. Coiner, 155, W.Va 591, 186 S.E.2d 220**

James A. Lucas # 3341231

Page 2    (Grievance # 16-MOCC-0-88

On 27 August, 2016, I filed a grievance against MOCC for banning inmates and private citizens alike from wearing any sort of head covering during open house. One example stressed, resulting in the unnecessary exposure to 90° sunlight for individuals including young children and the elderly, was that of being forced to endure extended exposure while listening to the inmates bands. On 23 January, 2017, I filed a 1983 lawsuit against WVDOC and MOCC for violating the Eighth Amendment to the Federal Constitution. The Suit is still pending. .

Being career military and quite familiar with the proclivities of power obsessed individuals, the only thing I asked for in the 1983, other than a reasonable and more humane alternative to a ban on head wear was - **"a reasonable assurance from DOC that the open house privilege (or any other privilege) will not be taken away from the inmate population in retaliation for the 1983."** The resultant act of revenge was so predictable.

After more than fifteen years of playing in the music program, on March 20, 2017 **(the month following the dissemination of the 1983)** the Bluegrass Band that I play for was notified (through the *he said/she said* grapevine) that "any member who is not "IRPP compliant" (meaning the inmate is not current with the classes that MOCC deems necessary for him to take) will no longer be allowed to participate in the music program - and of course, consequently no longer be allowed to play during open house.

I have, for seventeen years, refused to take the core "classes" because I feel to do so is to admit to a crime that I am not guilty of, and **that is never going to change.** I've always believed the particular policy that attempts to force an inmate to take such a class is violative of the Federal Constitutional Fifth Amendment right to avoid self-incrimination. It is time to determine the legality of such a policy.

I'm not a big fan of confrontation but when confrontation is the only choice, neither do I shy away from it. I have made it a habit of obeying rules to the best of my ability during my entire lifetime, regardless of how insipid I feel they may be, I finished a military career with five gold stripes on my sleeve and among other ribbons and medals, including the Navy Commendation Medal w/combat "V", five good conduct medals covering twenty years of military service. And though I shouldn't even be here, I've been in prison for seventeen years without a single black mark on my record. Additionally, during the past decade I have personally raised or donated thousands of dollars to MOCC's many charity drives. But apparently, *obedient, courteous, respectful,* and *beneficent* are not recognized as behavioral qualities that those in power value. Regardless of how many write-ups an inmate is able to accrue, how much the gang-banger flaunts authority, or how ill-bred or profane he is in general discourse and/or comportment, if MOCC can get his signature on a 'sign-up' sheet and collect their "tuition," the inmate is showered with more and more 'privileges.' There is nothing wrong with giving the IRPP compliant some extra privileges, (such as special packages or jobs) but **punishing inmates who don't deserve to be punished because they are not taking classes is the power obsessed out of control - IT IS WRONG!!** IRPP mania has zipped right on past the point of irrational preoccupation. This may be a heartbreaking revelation, but *IRPP compliance is not the most important consideration in running a prison* and making it so takes incentive away from inmates to accomplish anything else. This is a prison, not a concentration camp!

That this is nothing but a sophomoric response in retaliation (the new IRPP vs. Band room 'policy') could not be more obvious. The timing alone is an indictment. The "IRPP compliance" policy started in late 2009 simply because (I think) DOC found that it was a good source of **$$$$$.** The policy was essentially that you could not get special package requests approved or you could not get a job if you were not compliant. To entertain any serious thought that it was pure coincidence that the first major change to the policy in seven years came immediately after the 1983 was disseminated is farcical. The lone target (the band room) and the critically small number of inmates affected **(ONE)** is also probative to the claim of retaliation. Immediately after a band practice on 3-20-17. the Bluegrass band's lead singer was called into the Gym office and told he was no longer eligible to play because he wasn't IRPP compliant. **To date, he is the only "IRPP" casualty!** No reasonable person would consider that to be fair. I don't know about anyone else, but **I know that MOCC knows I am not, never have been, and never will be IRPP compliant.** Even if such an unreasonable policy were to become necessary, it appears to me that any professional administrator would have promulgated a written policy. This decision was made by someone who was in such a sweat to "get even," they didn't find it obligatory to even write up a memo, and these knee-jerk reactions to the 1983 serve only to append more credibility to the claim of vindictive retaliation. *This new 'IRPP policy' is clearly reprisal motivated by a desire for revenge against an inmate for exercising his right to challenge MOCC through the grievance process, and as a consequence, it is a Federal question falling cleanly under the First Amendment.*

To date, (4-10-17) I've heard nothing but inmate chatter re the 'new policy,' and I do not plan my day around scuttlebutt. Call me paranoid but I think the only reason they avoid me is - to target me would make the retaliation even more obvious. Regardless, when I'm no longer eligible for band room participation, someone in authority or a written policy will be needed to apprise me of same - and that will be the day this grievance is filed. Until then, I will continue to play in the band room.

I've played music for 72 years, and as much as I'd hate to lose it, my principles are not for sale to underline, under any pretext. **And I don't kiss anyone's ass, for any reason.**

The IRPP essentials have nothing to do with the music program. Our band member should be reinstated, and this latest unfair IRPP 'policy' should be vacated.

(2) GRIEVANCE # 17-MOCC-0-51

ADDENDUM *3 - 3

§ II - IRPP Compliance.

It is my contention that the present MOCC policy of forcing inmates to take classes, **and punishing those who do not take classes,** is under some circumstances a violation of the *5th Amendment protection of immunity from self-incrimination.* If a person is not guilty of a crime, pleads "not guilty", and despite a verdict of "guilty," [1] has maintained his/her innocence - ***to 'require' him/her to take any class that presupposses guilt, or any class that was recommended or assigned as a result of a charged offense is forcing him/her to concede guilt just by accepting and attending the class.***

[1] There has been a sufficient number of prison inmates exonerated from DNA evidence alone (more than thirty who were sitting on death row's around the country, and some convicted on eye-witness testimony) to effectively argue that a "guilty verdict" does not prove absolute guilt.

What I want:  MOCC's IRPP mania is out of control, and the willy-nilly policy of forcing all inmates to take classes, **and punishing those who refuse,** needs to cease!



(2)  Grievance #2017-MOCC-OAK-95

ADDENDUM B-4

§ I - Prison Regulations.

Recently, the Bluegrass Band lost two members as a result of a new suspect "IRPP" rule, and as a result, lost our band spot because it took the band below 3 original members. This perversion of the 'rules' has been challenged in Federal Court (2:17-cv-03144) as a violation of the First Amendment Right to freedom of expression under a claim of retaliation against an inmate for filing a previous grievance/lawsuit.

The problem now is -

(a) I can find no written DOC Policy (Memo's do not constitute DOC Policy) that makes <u>any</u> class mandatory.

(b) I can find no written DOC Policy pertaining to an inmate's obligations for becoming and remaining "IRPP compliant."

(c) I can find no written DOC Policy authorizing MOCC staff (especially civilian personnel) to decide or dictate DOC Policy.

(d) I can find no written DOC Policy authorizing MOCC staff (especially civilian personnel) to punish inmates for violation of what is apparently nonexistent DOC Policy.

**Prison Regulations must be posted.** *Gillespie vs Kendrick (1980), 164 W.Va. 599, 265 Se2d 537.* "The **first requirement** on a government agency responsible for prisoners by this section is **publication of rules and regulations** to apprise them of conduct required for them to earn good time credits." (emphasis added)

Written and posted regulations not only apprise the inmate of what is expected of him, it prevents the bastardizing of "rules" when fractious staff members feel the urge to use the obfuscated 'rules' as a vehicle for personal vendettas..

What I want:  I want IRPP imperatives and inmate obligations translated into written DOC Policy.



(2)  GRIEVANCE #2017-MOCC-OAK-76

**STATE OF WEST VIRGINIA**

**DIVISION OF CORRECTIONS**

**POLICY DIRECTIVE**
*335.00*

**NUMBER:**   335.00

**DATE:**   01 February 2014

**SUBJECT:**   Inmate Grievance Procedures

**AUTHORITY:** 42 U.S.C. §1997e(a); <u>Booth v. Churner</u>, 532 U.S. 731 (2001); <u>Porter v. Nussle</u>, 534 U.S. 516 (2002); <u>Woodford v. Ngo</u>, 548 U.S. 81, 93 and 103 (2006); <u>State ex rel. Fields v. McBride</u>, 216 W.Va. 623, 609 S.E.2d 884 (2004); WV Code 62-13-4 and W.Va. Code § 25-1A-2; ACA Standard 4-4284; PREA Standard 115.52

---

I.   **POLICY:**   It is the policy of the West Virginia Division of Corrections (WVDOC) to maintain a mechanism that ensures the promulgation of uniform procedures concerning the formal review of issues relating to any aspect of confinement for inmates confined in its institutions/facilities/centers.  It is also the policy of the West Virginia Division of Corrections that all inmates be required to fully and properly utilize these procedures to the fullest extent required under any forum for which the inmate would otherwise seek judicial redress within.

II.   **CANCELLATION:**  Policy Directive 335.00, dated 01 August 2013.

III.   **DEFINITIONS:**

1.   "Accept" shall mean the act of formally receiving the grievance for a review of the grievance on the merits.

2.   "Commissioner" shall mean the Commissioner of Corrections.  Any task to be completed by the Commissioner herein may be completed by his/her designee.

3.   "Days" shall mean working days exclusive of weekends or state holidays.

4.   "Exhaustion" shall mean submitting an accepted grievance and properly appealing an accepted grievance fully and receiving a final response thereto by the Commissioner.  Rejections do not constitute exhaustion.  Remands are not final responses unless expressly stated in the decision.

5.   "Grievance" shall mean the formal process by which an inmate seeks redress over any matter concerning prison life, whether it involves general circumstances or particular episodes.  The term "grievance" shall be considered the administrative remedy for inmates unless this policy specifically sets forth another administrative procedure.

6.   "Grievance Number" shall be a number affixed at the inmate's place of incarceration or point of receiving the grievance which shall be set by a two digit number for the year in which the grievance is filed (ex. 07) separated by a hyphen, the second part of the number

| ACC | Anthony Correctional Center | MDC | McDowell/Stevens Correctional Center |
| BCC | Beckley Correctional Center | MOCC | Mount Olive Correctional Complex |
| CWRC | Charleston Work Release Center | NCC | Northern Correctional Center |
| DCC | Denmar Correctional Center | OCC | Ohio County Correctional Center |
| HCC | Huttonsville Correctional Center | PBCC | Parkersburg Correctional Center |
| HWCC | Huttonsville Work Camp | PCC | Pruntytown Correctional Center |
| HWRC | Huntington Work Release Center | SCC | Salem Correctional Center |
| LCC | Lakin Correctional Center | SMCC | St. Marys Correctional Center |
| MCC | Martinsburg Correctional Center | SWC | Slayton Work Camp |

a.   After the institution/facility/center designation and a hyphen, the institution/facility/center shall assign a distinct sequential number which shall be utilized for tracking the grievance and for reference. The number shall be set forth by the inmate's unit designation and a sequential number separated by a hyphen.

b.   For the purpose of tracking the grievances, the Unit Manager of each unit shall maintain a log of grievances. This grievance log shall conform to Attachment #1 and sequential numbers shall be assigned from the beginning of each calendar year. An example is below:

**Grievance Log**

Facility:   Mocc

Unit: Elm            Calendar Year:   2010

| Seq.# | Doc # | Inmate | Date Filed | Issue | Resp. Date |
|-------|-------|--------|------------|-------|------------|
| 1 | 12345-3 | Horwitz, Harry Moses | 01-08-10 | Wants popcorn | 01-12-10 |
| 2 | 23456-3 | Feinberg, Louis | 01-09-10 | housing assignment | 01-12-10 |
| 3 | 34567-3 | Horwitz, Jerome | 01-11-10 | needs medication adjusted | |

Based on the example: The grievance numbers would be assigned as follows:

| Horwitz, Harry Moses: | 10-Mocc-Elm-01 |
| Feinberg, Louis: | 10-Mocc-Elm 02 |
| Horwitz, Jerome: | 10-Mocc-Elm-03 |

7.   "Inmate" shall mean an inmate either presently at the institution/facility/center or having previously been incarcerated at the institution/facility/center.

8.   "Investigate" refers to a process, whether formal or informal, by which information necessary to compile a response is provided. It can be as simple as a verbal inquiry or can involve a more detailed investigation.

9.   "Reject" shall mean a refusal to review a grievance on the merits due to a failure of the inmate to follow the procedural requirements for filing such grievance. Except in cases filed under Section V, E or V, F of this Policy Directive, grounds for rejection shall include but not be limited to failure to file the grievance in a timely manner; filing a grievance on a matter that has been previously submitted in a prior grievance; attaching

excessive pages; submitting writing on multiple sides of a page; submitting a grievance appeal out of conformity with this policy (for example; including more than one grievance in a mailing or any other matter that would be out at variance with this policy).

10.     "Remand" means to return a grievance to a lower level for further action.  When a grievance is remanded, unless the decision specifies otherwise, it is expected that a new decision will be issued at the level to which the grievance is remanded and the process continues at that level in the same manner as if it were originally filed/appealed to that level. Unless other times are specified, action on a remand shall occur within ten (10) days of its receipt.

11.     Sexual abuse:  Encompasses (a) inmate-on-inmate sexual abuse, (b) inmate-on-inmate sexual harassment, (c) staff-on-inmate sexual abuse, and (d) staff-on-inmate sexual harassment.

   a.     Inmate-on-inmate sexual abuse: Encompasses all incidents of inmate-on-inmate sexually abusive contact and inmate-on-inmate sexually abusive penetration.

       1)     Inmate-on-inmate sexually abusive contact: Non-penetrative touching (either directly or through the clothing) of the genitalia, anus, groin, breast, inner thigh, or buttocks without penetration by an inmate of another inmate without the latter's consent, or of an inmate who is coerced into sexual contact by threats of violence, or of an inmate who is unable to consent or refuse.

       2)     Inmate-on-inmate sexually abusive penetration: Penetration by an inmate of another inmate without the latter's consent, or of an inmate who is coerced into sexually abusive penetration by threats of violence, or of an inmate who is unable to consent or refuse. The sexual acts included are:

           a)     Contact between the penis and the vagina or the anus.

           b)     Contact between the mouth and the penis, vagina, or anus.

           c)     Penetration of the anal or genital opening of another person by a hand, finger, or other object.

   b.     Inmate-on-inmate sexual harassment: Repeated and unwelcome sexual advances, requests for sexual favors, verbal comments, or gestures or actions of a derogatory or offensive sexual nature by one inmate directed toward another.

   c.     Staff-on-inmate sexual abuse: Encompasses all occurrences of staff-on-inmate sexually abusive contact, staff-on-inmate sexually abusive penetration, staff-on-inmate indecent exposure, and staff-on-inmate voyeurism. Staff solicitations of inmates to engage in sexual contact or penetration constitute attempted staff-on-inmate sexual abuse.

       1)     Staff-on-inmate sexually abusive contact: Non-penetrative

touching (either directly or through the clothing) of the genitalia, anus, groin, breast, inner thigh, or buttocks by a staff member of an inmate with or without the latter's consent that is unrelated to official duties.

2) Staff-on-inmate sexually abusive penetration: Penetration by a staff member of an inmate with or without the latter's consent. The sexual acts included are:

a) Contact between the penis and the vagina or the anus.

b) Contact between the mouth and the penis, vagina, or anus;

c) Penetration of the anal or genital opening of another person by a hand, finger, or other object.

3) Staff-on-inmate indecent exposure: The display by a staff member of his or her uncovered genitalia, buttocks, or breast in the presence of an inmate.

4) Staff-on-inmate voyeurism: An invasion of an inmate's privacy by staff for reasons unrelated to official duties or when otherwise not necessary for safety and security reasons, such as peering at an inmate who is using a toilet in his or her cell; requiring an inmate to expose his or her buttocks, genitals, or breasts; or taking images of all or part of an inmate's naked body or of an inmate performing bodily functions and distributing or publishing them.

d. Staff-on-inmate sexual harassment: Repeated verbal comments or gestures of a sexual nature to an inmate by a staff member. Such statements include demeaning references to gender, sexually suggestive or derogatory comments about body or clothing, or obscene language or gestures.

12. "Unit Manager" shall refer to the Unit Manager of the housing unit to which the inmate is assigned. In any housing unit that does not have a Unit Manager, the person occupying the position of Unit Manager for purposes of this policy shall be the commanding officer of such unit.

13. "Warden/Administrator" shall refer to the Chief Executive Officer (CEO) of the institution/facility/center in which the inmate is confined and shall also include Work Release Administrators. All tasks designated to a Warden/Administrator in this policy may be completed by a designee.

IV. **APPLICABILITY:** All units within the Division of Corrections for all matters except classification which shall follow administrative remedies set forth in Policy Directives 401.01 and 326.01 and inmate discipline which shall follow administrative remedies set forth in Policy Directive 325.00.

V.   **PROCEDURES:**

A.   General Provisions

1.   Nothing in this Policy Directive shall be construed to provide an inmate with any additional liberty interest that would not otherwise exist if this Policy Directive did not exist.

2.   Copies of all inmate grievances, appeals, and responses at Unit Manager and Warden/Administrator's level shall be maintained at the institution/facility/center.  Once appealed to the Commissioner, the grievance shall be filed within the inmate's central office file.  Only the grievance filed within the central office shall be indicative of whether the inmate has exhausted administrative remedies.

3.   Third parties, including fellow inmates, staff members, family members, attorneys, and outside advocates, shall be permitted to assist inmates in filing request for administrative remedies relating to allegations of sexual abuse, and shall also be permitted to file such request on behalf of inmates.

4.   Except for allegations brought under Sections V, E or V, F of this Policy Directive, an inmate may not use the Inmate Grievance Procedure to submit a grievance or appeal on behalf of another inmate or for any matter that does not directly affect the inmate filing the grievance.

5.   Any inmate who fails to fully and properly comply with the provisions set forth in this Policy Directive shall not be considered to have taken full advantage of administrative remedies afforded him/her and therefor has not exhausted administrative remedies.

6.   The Warden/Administrator shall maintain a searchable record of all grievances.  The record shall be searchable in the following manners: name or DOC number of inmate; grievance number; type of grievance; and the date of filing.

7.   This Policy Directive represents the general administrative remedy procedures for the Division of Corrections.  Staff shall be instructed that this Policy Directive will apply to any issue advanced by an inmate that does not have a specific administrative remedy identified by this policy. Inmates should, as a general guideline, not to be told that an issue is not "grievable."  If an issue is not properly presented under this Policy Directive, the inmate should be instructed as to the proper policy and procedure for seeking an administrative remedy.  However, being able to grieve an issue does not equate to being entitled to the relief sought.

B.   Unit Manager Level:

1.  Any inmate may file a grievance utilizing a grievance form within fifteen (15) days of any occurrence that would cause him/her to file a grievance (Attachment #2). These forms shall be made available to members of the inmate population at all institutions/facilities/centers. At a minimum, grievance forms shall be available in all inmate housing units and the law libraries.

2.  An inmate may grieve only one (1) issue or complaint per form and, except for grievances pursuant to Sections V, E or V, F of this Policy Directive, the issue must directly pertain to the inmate filing the grievance.

3.  The grievance form shall initially be submitted by the inmate to his/her Unit Manager. Upon receipt of the grievance form, the Unit Manager shall log the grievance and assign it a number in conformity with the procedure set forth in Section III of this Policy Directive.

4.  Prior to responding to the grievance, the Unit Manager shall inspect the grievance to determine whether the grievance was filed in a timely manner; whether the grievance contains excessive pages; whether the grievance is otherwise not submitted within the proper format; or whether the grievance seeks to discuss matters previously addressed in a prior grievance. If the grievance is not filed within a proper time frame, contains excessive pages, is not within the proper format or seeks to present an issue previously addressed, the Unit Manager shall reject the grievance, providing a brief explanation of the grounds for rejection, and return the grievance to the inmate, noting the rejection on the log. **Except for grievances rejected due to having been previously addressed in a grievance or those filed beyond the time limits to file a grievance,** the inmate shall have five (5) days to correct the defect and re-file a new grievance. An inmate may appeal a rejection in the same manner as a decision, but the scope of the appeal is limited only to the propriety of the rejection and not to the merits such that appeal the rejection to the commissioner does not exhaust administrative remedies on the issue presented in the defective grievance.

5.  It shall be the responsibility of the Unit Manager to ensure that an answer to the grievance is provided back to the inmate within five (5) days. The response should be clear, concise, complete, and professional. The Unit Manager is not required to personally answer the grievance, so long as he/she ensures that the grievance ultimately received is timely addressed and, if accepted, answered. *Provided* that the Unit Manager shall ensure that the staff member to which the grievance pertains shall not be responsible for answering the grievance. In the case of accepted grievances addressing questions of health care, the Unit Manager shall route the grievance to the institution's/facility's/center's health care administrator to review and provide the inmate an answer. However, the Unit Manager, while not reading the grievance response from the medical unit, shall ensure that a response has been completed and provided to the inmate, logging the same.

6.    The inmate shall be provided a copy of his/her grievance form prior to submission at each level for the inmate's records. The inmate may attach to the grievance only one (1) 8.5 x 11 inch page with writing on a single side. Only one staple may be used to affix the pages together. The inmate may not tear, fold, or affix tape to the forms, except that the forms may be folded and placed into a number 10 envelope.

7.    If the Unit Manager fails to answer or reject the grievance within the time frame noted in Section V, B, 5 of this Policy Directive, the inmate may treat the non-response as a denial of his/her grievance. The inmate shall indicate on the form that the grievance that was set forth in the form to the Warden/Administrator was previously filed without a response to the Unit Manager. The Warden/Administrator shall investigate such allegation. If it is determined that the inmate had submitted a grievance without response, the Warden/Administrator shall require and immediate response from the Unit Manager. If it is determined by the Warden/Administrator that the inmate had either not filed the form with the Unit Manager or had been given a timely response, the Warden/Administrator shall initiate appropriate disciplinary action under Policy Directive 325.00.

C.    Appeals to the Warden/Administrator:

1.    Should the response at the Unit Manager level not resolve the issue, the inmate may appeal to the Warden/Administrator within five (5) days from delivery of the response to his/her grievance. The inmate shall use the same form as was submitted to the Unit Manager and signing in the appropriate location. Only the grievance form and Unit Manager's response shall be submitted. Submission of any additional materials beyond the initial grievance and response shall be grounds to reject the appeal, except in the case of grievances submitted pursuant to Sections V, E or V, F of this Policy Directive.

2.    As with the initial level, the inmate shall be provided a copy of his/her grievance form prior to submission to the Warden/Administrator for his/her records. Only the grievance form [including the one (1) page attachment submitted to the Unit Manager, if any] and the Unit Manager response is to be copied.

3.    Prior to responding to the appeal, the Warden/Administrator shall review the grievance to determine whether any grounds for rejection exists in the same manner as Sections V, B, 4 or V, C, 1. If such exists, the grievance shall be rejected in the same manner as provided in Section V, B, 4.

4.    The Warden/Administrator shall respond to the appeal, using the grievance form, within five (5) days. The Warden/Administrator shall consider the statement of the grievance, as presented at the initial level, together with the Unit Manager's response to determine whether the response is appropriate and in furtherance with the mission of the Division of

Corrections and consistent with the orderly operation of the institution/facility/center. After a review of the grievance, the Warden/Administrator may: affirm the Unit Manager and deny the grievance; deny the grievance for reasons other than that which is addressed by the Unit Manager; grant the grievance; or remand the grievance back to the Unit Manager for further action. In reviewing the grievance, the Warden/Administrator should place the expectation upon the Unit Manager that the grievance will be fully addressed at his/her level such that additional investigation should rarely be necessary and that a decision can be rendered from a review of the grievance document. If a grievance has not been properly submitted through any level by an inmate, it shall be rejected.

D.   Appeals to the Commissioner

1.   Should the inmate believe that the Warden/Administrator's response does not resolve his/her grievance or the Warden/Administrator fails to respond in the time frames set forth in Section V, C, 4 of this Policy Directive, the inmate may submit an appeal to the Commissioner of the Division of Corrections within five (5) days after he/she receives the Warden/Administrator's response or the time for the response has passed. The appeal shall be submitted using the same form as was submitted to the Unit Manager and signing the appropriate location. Only the grievance form together with the Unit Manager and Warden/Administrator's response shall be submitted. Each grievance appealed to the Commissioner shall be mailed to the Commissioner by first class mail. **Only one (1) grievance per envelope shall be permitted.** Except for grievances filed pursuant to Section V, E, submission of multiple grievances or submission of grievances bound with tape or more than one stable or by any other means shall be grounds for rejection of the entire mailing in addition to all other grounds. The inmate may not tear or fold the forms, except that the forms may be folded to place it in a number 10 envelope. The grievances shall be appealed to the Commissioner by mailing only the grievance form and a single 8.5 inch page attachment, together with any response from the unit level and Warden/Administrator to the Commissioner at the following address:

> W.V. Division of Corrections
> Commissioner's Office
> Attention: Inmate Grievance Review
> 1409 Greenbrier Street
> Charleston, WV 25311

2.   As with the initial level and Warden/Administrator's level, the inmate shall be provided a copy of his/her grievance form prior to submission to the Commissioner for his/her records. Only the grievance form [including the one (1) page attachment submitted to the Unit Manager, if any] and responses are to be copied.

3. Prior to responding to the appeal, the Commissioner shall review the grievance to determine whether any grounds for rejection exists in the same manner as Sections V, B, 4; V, C, 1; V, D, 1; or any other provision of this Policy Directive. If such exists, the grievance shall be rejected in the same manner as provided in Section V, B, 4 of this Policy Directive.

4. The Commissioner shall respond to the appeal, in writing, within ten (10) days. The Commissioner shall consider the statement of the grievance, as presented at the initial level, together with the Warden/Administrator and Unit Manager's response to determine whether the response is appropriate and in furtherance with the mission of the Division of Corrections and with the orderly operation of the institution/facility/center. Upon review of the grievance, the Commissioner may: affirm the Warden/Administrator and deny the grievance; deny the grievance for reasons other than that which is addressed by the Warden/Administrator and Unit Manager; grant the grievance; or remand the grievance back to the Warden/Administrator or Unit Manager for further action. In reviewing the grievance, an expectation is placed upon the Warden/Administrator and Unit Manager that the grievance will be fully addressed at their levels and additional investigation should rarely be necessary. A decision should be able to be rendered from a review of the grievance document. If a grievance has not been properly submitted through any level by an inmate, it shall be rejected. A rejected grievance does not exhaust the grievance process or that step of the process.

E. Special Procedures for Sexual Abuse:

1. In cases where an inmate alleges he/she has been sexually abused as defined in this Policy Directive, he/she shall follow the process provided in Section V, E of this Policy Directive.

   a. An inmate may file a grievance at any time concerning sexual abuse, and the grievances shall not be rejected at the Unit Manager's level.

   b. In any case where an inmate would be required to submit his/her grievance to a staff member he/she is alleging engaged in the sexual abuse, the inmate shall submit the grievance to the Warden/Administrator (or if the Warden/Administrator is the individual alleged to be the individual sexually abusing the inmate, to the Commissioner). The Warden/Administrator and/or the Commissioner, as the case may be, shall assign appropriate staff to respond to the grievance.

2. The time frames for processing the grievance and for appeals shall be the same as for ordinary grievances which requires completion of the process within sixty (60) days.

3. Reports and correspondence not initially filed as a grievance

a.    Whenever a staff member is notified either verbally or in writing of an allegation that an inmate has been sexually abused, including notification from another inmate, the staff member shall transmit a copy of this information to the Warden/Administrator, who shall forthwith transmit the same to the Director of the Corrections' Investigation Division and to the Inmate's Unit Manager. In the event the Warden/Administrator is the one accused of committing the sexual abuse, the copy shall be directly sent to the Director of the Corrections' Investigation Division and Unit Manager by the staff member. The Unit Manager shall consider such notification as a grievance submitted on behalf of the inmate and shall assign the information a grievance number. The Unit Manager shall ensure that all verbal reports are reduced to writing. A grievance or an appeal thereof relating to sexual abuse shall not be rejected due to defects in the form of the grievance or for any other reason for rejection as noted above.

b.    The Unit Manager or assigned staff member shall inform the inmate allegedly sexually abused that a grievance has been submitted on his/her behalf and shall process it under the above-stated procedures. The Unit Manager shall also request the inmate to complete a grievance form, but the inmate is not required to do so. If the inmate expressly request that it not be processed, the Unit Manager shall document any such request and close the grievance. Provided, however, that the Unit Manager shall remain responsible for ensuring the information was reported to the Corrections Investigation Division.

c.    After the Unit Manager's initial actions, the inmate will be responsible for personally pursuing any subsequent steps in the grievance process through exhaustion.

F.    Emergency Procedures:

1.    An inmate alleging that he/she is subject to a substantial risk of imminent sexual abuse may file a grievance directly to his/her Warden/Administrator who shall in turn cause an immediate review of the inmate's allegations and circumstances to determine whether such substantial risk of imminent sexual abuse exists. Such review can be in conjunction with an application for special management under Policy Directive 326.00. The scope of the Warden/Administrator's review shall be limited to whether the inmate is at substantial risk of imminent sexual abuse.

2.    As soon as possible, but no longer than within forty-eight (48) hours, the Warden/Administrator shall make an initial response determining whether the inmate's allegations that he/she is at substantial risk of imminent sexual abuse was substantiated; and , if so, the Warden/Administrator shall take all necessary corrective action. Within five (5) calendar days, the Warden/Administrator shall issue a final written response setting forth reasons supporting the decision and any

action taken.

3.    If no emergency exists, the Warden/Administrator shall return the grievance to the inmate and require the inmate to follow the normal grievance procedures.

4.    The Warden/Administrator shall provide a written explanation of why the grievance does not qualify as an emergency.

5.    Any inmate found to have intentionally filed an emergency grievance where no emergency exists and in bad faith shall be subject to disciplinary action under appropriate WVDOC Policy.

G.    Special Procedures for Allegations of Violence and Imminent Violence.

1.    An inmate alleging that he/she is in danger of imminent violence shall file a grievance to his/her unit manager or, if the unit manager is unavailable, to the shift commander. Any staff person receiving a grievance in which an inmate alleges he/she is in danger of imminent violence shall immediately forward the grievance to the unit manager or, if the unit manager is unavailable, to the shift commander.

2.    The unit manager or shift commander upon receipt of such grievance shall cause an immediate review to take place of the inmate's allegations and circumstances to determine whether a substantial risk of imminent violence exists. The unit manager or shift commander can refer the review to the designated staff, or can have the review processed as an application for special management under Policy Directive 326.00 or processed in conjunction with any other policy directive or operational procedure which is intended to handle such claims of imminent violence.

3.    "Imminent violence" means an act of violence which:

a. Has the potential to cause substantial bodily injury or greater to the inmate.

b. Has a reasonable possibility of occurring in the immediate or near future.

4.    An inmate alleging that he/she is in danger of imminent violence shall in the grievance set forth with specificity the nature of the threat of imminent violence and list any person who the inmate believes may cause him/her bodily injury or greater. An inmate shall receive assistance, if needed, in providing such information in writing.

5.    As soon as possible, but no longer than within forty-eight (48) hours, the review shall make an initial response determining whether the inmate's allegations that he/she is at substantial risk of imminent violence is substantiated. If the initial review finds that the allegation of imminent violence is substantiated or is unable to find that the allegation of imminent violence is unsubstantiated, the facility shall cause appropriate action, if needed, to protect the safety of the inmate.

6.    Within five (5) calendar days, the unit manager or shift commander shall issue a written response to the inmate's grievance. The response to the grievance shall confirm that the inmate's allegations have been reviewed or processed under Policy Directive 326.00 or processed in conjunction with any other policy directive or operational procedure which is intended to handle claims of violence, and state whether the review substantiated the inmate's allegations and what, if any, actions have been taken in the matter. The response, however, shall not include information regarding private personnel actions.

7     An inmate alleging that he/she is subject to violence which is not imminent may file a grievance to his/her unit manager who shall in return cause the allegations to be reviewed. The unit manager can refer the review to designated staff, or can have the review processed as an application for special management under Policy Directive 326.00 or processed in conjunction with any other policy directive or operational procedure which is intended to handle claims of violence.

8.    In any case where an inmate would be required to submit his/her grievance to a staff member he/she is alleging has threatened him/her with violence, the inmate shall submit the grievance to the Warden/Administrator (or if the Warden/Administrator is the individual alleged to have threatened him/her with violence, to the Commissioner). The Warden/Administrator and/or the Commissioner, as the case may be, shall assign appropriate staff to respond to the grievance.

9.    Except for as set forth in the above special procedures, a grievance alleging violence and or imminent violence shall follow the procedures for ordinary administrative remedies.

Jim Rubenstein, Commissioner                    February 1, 2014
                                                Date

Policy Directive 335.00
01 February 2014
Attachment #1

Grievance Log

Facility:_____

Unit:_____          Calendar Year:_____

| Seq.# | Doc# | Inmate | Date Filed | Issue | Resp. Date |
|-------|------|--------|-----------|-------|-----------|
|       |      |        |           |       |           |
|       |      |        |           |       |           |
|       |      |        |           |       |           |
|       |      |        |           |       |           |
|       |      |        |           |       |           |
|       |      |        |           |       |           |
|       |      |        |           |       |           |
|       |      |        |           |       |           |
|       |      |        |           |       |           |
|       |      |        |           |       |           |
|       |      |        |           |       |           |
|       |      |        |           |       |           |
|       |      |        |           |       |           |
|       |      |        |           |       |           |
|       |      |        |           |       |           |
|       |      |        |           |       |           |
|       |      |        |           |       |           |
|       |      |        |           |       |           |
|       |      |        |           |       |           |
|       |      |        |           |       |           |
|       |      |        |           |       |           |
|       |      |        |           |       |           |
|       |      |        |           |       |           |
|       |      |        |           |       |           |
|       |      |        |           |       |           |
|       |      |        |           |       |           |
|       |      |        |           |       |           |

ONE STAPLE ONLY

Policy Directive 335.00
01 February 2014
Attachment #2

W.Va. Division of Corrections Inmate Grievance Form          Grievance No. _____-_____-_____-_____

_____          _____          _____
Inmate Name                              DOC #               Date of Grievance

State Nature of Grievance / Issue to be addressed (Note 1 issue per grievance be concise file with Unit Manager NO WRITING ON BACK):

_____
_____
_____

Relief Sought (state what you
want):_____
_____

_____          (The inmate may attach 1 8.5 x 11 sheet if necessary at this level only)
Inmate's Signature
*************************************************************************************************
Unit Manager's Response (attach additional sheet if needed)

Accepted_____          Rejected____          Reason for rejection:_____          Date:_____

Response on Merits if accepted:

_____
_____

_____
Signature
*************************************************************************************************
Resolved:_____ (if so initial and give copy to unit manager)          Appealed to Warden/Administrator _____(initial) Date:_____

If no response at initial level is included the inmate certifies that he/she has tendered this grievance as indicated above and no response has been issued at that level within the time frames set forth in Policy Directive 335.00

_____          _____
Inmate's Signature                            Date
*************************************************************************************************
Action by Warden/Administrator:
Accepted_____          Rejected____          Reason for rejection:_____          Date:_____

Response on Merits if accepted:  __ Remand to Unit for further action          __ Affirm unit and/or deny grievance __ Grant the Grievance as specified
Comments_____

_____          _____          (Attach additional sheet if necessary)
Warden/Administrator's Signature                Date
*************************************************************************************
Resolved:_____ (if so initial and give copy to unit manager)          Appealed to Commissioner _____(initial)

If no response at Warden/Administrator'sl level is included, the inmate certifies that he/she has tendered this grievance as indicated above and no response has been issued at that level within the time frames set forth in Policy Directive 335.00

_____          _____
Inmate's Signature                            Date
*************************************************************************************************
Action by Commissioner:

Accepted_____          Rejected____          Reason for rejection:_____          Date:_____
Response on Merits if accepted:  __ Affirm Warden/Administrator and deny grievance   (Affix final stamp)          ____ Other, memo attached.

JAmes LucAs 334/231
One MountAinside WAy
Mount Olive, WV 25185

To
Clerk, U.S. District Court
P.O. Box 2546
Charleston, WV 25329

DEC 14 2017

CORRESPONDENCE PROCESSED
AN INMATE AT MOUNT OLIVE
CORRECTIONAL COMPLEX

UNITED STATES POSTAGE
$ 01.82⁰
02 1M
MAILED FROM ZIP CODE 25186